# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB<br>2101 Webster St., Suite 1300<br>Oakland, CA 94612,<br>*Plaintiff*,<br><br>v.<br><br>MICHAEL S. REGAN, Administrator,<br>U.S. Environmental Protection Agency, in his<br>official capacity,<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460,<br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     This is a suit to compel the Administrator of the United States Environmental

Protection Agency ("EPA") to take actions mandated by the Clean Air Act, 42 U.S.C. §§ 7401-

7671q, to protect public health and the environment from air pollution emitted by two categories

of solid waste incinerators. EPA has failed to issue mandatory federal plans implementing EPA's

standards for commercial and industrial solid waste incinerators ("CISWI") and standards for

other categories of solid waste incinerators ("OSWI"), in violation of 42 U.S.C. § 7429(b)(3).

These failures constitute "agency action unreasonably delayed" within the meaning of section

304(a) of the Clean Air Act. *Id.* § 7604. Failure to complete these mandatory actions allows

incinerators in these categories to either escape regulation under 42 U.S.C. § 7429 entirely or to

continue operating under outdated regulations.

2.     Plaintiff Sierra Club seeks an order declaring that EPA's failure to issue federal

plans required by 42 U.S.C. § 7429(b)(3) constitutes action unreasonably delayed under the

Clean Air Act, and compelling EPA to issue federal plans in accordance with an expeditious

deadline set by this Court.

## JURISDICTION AND VENUE

3.      This action arises under section 129(b)(3) of the Clean Air Act. 42 U.S.C.

§ 7429(b)(3).

4.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a) and

28 U.S.C. §§ 1331 and 1361.

5.      This Court may issue a declaratory judgment, order the Administrator to perform

the requisite acts and duties, and grant further relief pursuant to 42 U.S.C. § 7604(a), 28 U.S.C.

§§ 2201-2202, and 28 U.S.C. § 1361.

6.      Sierra Club has a right to bring this action pursuant to section 304(a) of the Clean

Air Act, 42 U.S.C. § 7604(a), as well as 28 U.S.C. § 1361 and the Administrative Procedure Act,

5 U.S.C. §§ 701-706.

7.      By certified letter to the Administrator mailed on August 2, 2022, Sierra Club

gave notice of this action as required by 42 U.S.C. § 7604(a).

8.      As 180 days have passed since Sierra Club provided notice, Sierra Club has

satisfied the notice requirements in 42 U.S.C. § 7604(a).

9.      Venue is vested in this Court under 28 U.S.C. § 1391(e) because EPA

Administrator Michael S. Regan resides in this district.

## PARTIES

10.     Plaintiff Sierra Club is a nonprofit corporation with its headquarters located in

Oakland, California. Sierra Club is a national membership organization whose mission is to

explore, enjoy, and protect the planet; to practice and promote the responsible use of the Earth's

ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the

natural and human environment; and to use all lawful means to carry out those objectives. As such, Sierra Club is dedicated to the protection of public health and the environment and regularly advocates for policies that protect air quality. It has over 63 chapters and 730,000 members who reside in all 50 states, the District of Columbia, and Puerto Rico.

11.     Defendant Michael S. Regan is the Administrator of EPA. In that role, he is charged with the duty to uphold the Clean Air Act and to take required regulatory actions according to the schedules established therein. *See* 42 U.S.C. § 7601.

## LEGAL FRAMEWORK

### EPA's Duty Under the Clean Air Act to Issue Federal Plans for Incinerators

12.     The Clean Air Act's purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." *Id.* § 7401(b)(1). A "primary goal" of the Act is "pollution prevention." *Id.* § 7401(c). Congress enacted this law in part because "the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare." *Id.* § 7401(a)(2).

13.     The Clean Air Act directs EPA to "establish performance standards and other requirements . . . for each category of solid waste incinerations units," including commercial and industrial solid waste incinerators ("CISWI") and other categories of solid waste incinerators ("OSWI"). *Id.* § 7429(a)(1)(A); *see id.* § 7429(a)(1)(B)-(E).

14.     Performance standards must include emission limits for new or modified incinerators and existing incinerators. *Id.* § 7429(a), (b). New incinerators are those which commence construction after EPA proposes standards. *Id.* § 7429(g)(2). Modified incinerators

are those which are significantly modified after the effective date of a standard. *Id.* § 7429(g)(3).

Existing incinerators are those built prior to the proposal of standards and which have not been

modified at any time after those standards become effective. *Id.* § 7429(g)(4).

15.     Performance standards must require the maximum reduction in emissions of

certain pollutants that EPA determines is achievable, considering cost and any non-air quality

health and environmental impacts and energy requirements. *Id.* § 7429(a)(2), (a)(4), (b)(1).

Those pollutants include particulate matter, opacity, sulfur dioxide, hydrogen chloride, nitrogen

oxides, carbon monoxide, lead, cadmium, mercury, dioxins, and furans. *Id.* § 7429(a)(4), (b)(1).

16.     EPA must review and revise performance standards every five years. *Id.*

§ 7429(a)(5), (b)(1).

17.     Performance standards for new or modified incinerators are effective six months

after the date of promulgation. *Id.* § 7429(f)(1).

18.     Performance standards for existing incinerators must be implemented through a

state or federal plan to have effect. No later than one year after EPA promulgates initial or

revised performance standards for existing incinerators, states with existing incinerators must

submit a state plan to EPA for approval. *Id.* § 7429(b)(2). If a state has no existing incinerators

subject to the standards, it must submit to EPA a "negative declaration" saying so by the same

date. 40 C.F.R. §§ 60.2510, 60.2982.

19.     If within two years of EPA's promulgation of performance standards for existing

incinerators, any state has submitted neither an approvable state plan nor a negative declaration,

then EPA "shall develop, implement and enforce" a federal plan. 42 U.S.C. § 7429(b)(3).

20.     The federal plan applies upon adoption to existing incinerators "within any

category located in any State which has not submitted an approvable plan . . . with respect to

4

units in such category . . . ." *Id.* § 7429(b)(3); *see also, e.g.*, 40 C.F.R. § 62.14515 ("If your CISWI unit is located in a State that does not have an EPA approved State plan or your State's plan has not become effective," then EPA's federal plan for the most recent CISWI performance standards "applies to your CISWI unit until the EPA approves a State plan that covers your CISWI unit and that State plan becomes effective.").

21.     Although the Act refers to emission limits for existing incinerators as "emission guidelines," they are binding on states and EPA in the development of state and federal plans. 42 U.S.C. § 7429(b)(1). Implementation plans "shall assure that each unit subject to the plan is in compliance with all provisions of [performance standards]." *Id.* § 7429(b)(2); *see id.* § 7429(b)(3). "[T]he Federal plan must mirror substantive requirements of [performance standards]." EPA, Federal Plan Requirements for CISWI, 68 Fed. Reg. 57,518, 52,573 (Oct. 3, 2003). State plans "shall be at least as protective" as performance standards. *Id.* § 7429(b)(2).

22.     Once the performance standards, including emissions guidelines for existing incinerators, are implemented through a state or federal plan, they are binding on owners and operators. *Id.* § 7429(f)(3).

23.     Federal plans must include "an inventory of all designated [incinerators], including emission data for the designated pollutants and information related to emissions . . . ." 40 C.F.R. § 60.25(a).

24.     Federal plans must include provisions for "monitoring the status of compliance with applicable emission standards," including "[l]egally enforceable procedures for requiring owners or operators of designated [incinerators] to maintain records." *Id.* § 60.25(b); *see* 42 U.S.C. § 7429(c) (requiring monitoring of incinerators). EPA also requires that incinerators regulated under a federal plan "periodically report to the State information on the nature and

amount of emissions from such [incinerators], and/or such other information as may be necessary to enable the State to determine whether such [incinerators] are in compliance with applicable portions of the plan." 40 C.F.R. § 60.25(b)(1). Information reported to the state in this way "shall be correlated with applicable emission standards . . . and made available to the general public." *Id.* § 60.25(c).

25.     Federal plans must require the states where the plan is in effect to "submit reports on progress in plan enforcement to the Administrator on an annual (calendar year) basis . . . ." *Id.* § 60.25(e). These reports must include any enforcement actions initiated against covered incinerators and technical reports on performance testing conducted at covered incinerators, among other important information. *Id.* § 60.25(f).

26.     Congress provided that performance standards for existing units shall become effective "as expeditiously as practicable" after EPA approves a state plan or issues a federal plan "but in no event later than three years after" state plan approval. 42 U.S.C. § 7429(f)(2); *see id.* § 7429(b)(2).

27.     As additional backstops, Congress also provided that performance standards for existing incinerators "shall be effective" not later than five years after the date they are promulgated, *id.* § 7429(f)(2), and that federal plans "shall assure" compliance with the performance standards by the same five-year deadline, *id.* § 7429(b)(3). If EPA delays issuing a federal plan after a state fails to submit an approvable plan, it excuses incinerators in that state from complying with performance standards.

28.     Clean Air Act section 129 also requires that incinerators operate pursuant to a permit under the Title V program. *Id.* § 7429(e). Permits under this program are required to undergo public notice and comment during the application process. *Id.* § 7661a(b)(6). All

permits are publicly available and include enforceable emission standards for each regulated

emission source at a permitted facility. *See generally id.* §§ 7661a (permit programs), 7661c

(permit requirements and conditions).

29.     The Clean Air Act guarantees citizens a right to present their views and

information to EPA and have them considered by the agency. Section 307(d) of the Act applies

to "the promulgation of any requirement for solid waste combustion under section 7429 of this

title." *Id.* § 7607(d)(1)(D). Section 307(d) requires EPA to provide public notice of proposed

rulemaking accompanied by a statement of its basis and purpose, which must include "the factual

data on which the proposed rule is based," "the methodology used in obtaining the data and in

analyzing the data," and "the major legal interpretations and policy considerations underlying the

proposed rule." *Id.* § 7607(d)(3). Section 307(d) also requires EPA to allow any person to submit

written comments, data, or documentary information, and to present data, views, or arguments

orally. *Id.* § 7607(d)(5). EPA must consider such comments, data, and arguments submitted, and

respond to each of the significant comments, criticisms, and new data when promulgating the

final rule. *Id.* § 7607(d)(6)(B).

## FACTS

### Commercial and Industrial Solid Waste Incinerators

30.     Commercial and industrial solid waste incinerators include any incinerator that

combusts solid waste material from commercial or industrial establishments. *Nat. Res. Def.

Council v. EPA*, 489 F.3d 1250, 1257 (D.C. Cir. 2007).

31.     EPA's Enforcement and Compliance History Online database has identified 163

facilities with incinerators regulated as CISWI under 40 C.F.R. Part 60, Subparts CCCC and

DDDD. These incinerators are located in Alabama, Arkansas, Colorado, Connecticut, Florida,

Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Michigan, Missouri, New

Hampshire, North Carolina, North Dakota, Oklahoma, South Carolina, South Dakota, and

Tennessee.

32.     In 2000, EPA first promulgated performance standards for existing CISWI. Those

standards exempted so-called "energy recovery units" from regulation. EPA, Standards of

Performance for New Stationary Sources and Emission Guidelines for Existing Sources:

Commercial and Industrial Solid Waste Incineration Units, 65 Fed. Reg. 75,338, 75,342 (Dec. 1,

2000); *see id.* at 75,340.

33.     In 2003, EPA promulgated a federal plan implementing the 2000 CISWI

performance standards in states that had submitted neither an approvable state plan nor a

negative declaration.

34.     In 2007, the D.C. Circuit rejected EPA's exemption for energy recovery units as

unlawful. *Nat. Res. Def. Council v. EPA*, 489 F.3d at 1257-58.

35.     In 2011, EPA promulgated revised performance standards that, among other

revisions, regulated energy recovery units as CISWI. EPA amended those performance standards

on February 7, 2013.

36.     Within two years of the adoption of revised standards—that is, between February

7, 2013, and February 7, 2015—many states submitted neither an approvable state plan nor a

negative declaration stating they contained no CISWI, as required under 42 U.S.C. § 7429(b)(3).

According to EPA, even by 2017, the following states had submitted neither an approvable state

plan nor a negative declaration: New York, Illinois, Indiana, Texas, Louisiana, Oklahoma,

Arkansas, Kansas, Missouri, Nebraska, Utah, Wyoming, South Dakota, and Washington.

37.     Thus, since February 7, 2015, more than seven years ago, the Clean Air Act

required EPA to "develop, implement and enforce" a federal plan implementing the 2013 CISWI performance standards. 42 U.S.C. § 7429(b)(3).

38.     In 2017, EPA proposed a federal plan implementing the 2013 CISWI performance standards in states that had submitted neither an approvable state plan nor a negative declaration.

39.     The emission limits in the federal plan were "the same as those contained in the final CISWI [performance standards]." EPA, Federal Plan Requirements for Commercial and Industrial Solid Waste Incineration Units, 82 Fed. Reg. 3554, 3559 (proposed Jan. 11, 2017).

40.     Despite the requirements of the Act and EPA's proposal of a federal plan more than six years ago, EPA never issued a final federal plan.

41.     As a result of EPA's inaction, CISWI in some states continue to operate subject to outdated performance standards that EPA adopted in 2000, which, among other flaws, unlawfully exempted energy recovery units from regulation. According to EPA estimates in 2016, the federal plan would apply to 80 CISWI in 15 states out of 106 total CISWI in the country. Twenty-one of those units are energy recovery units that, due to EPA's inaction, are subject to no section 129 standards. As noted above, EPA's Enforcement and Compliance History Online database indicates that there are 163 incinerators subject to the CISWI rule, so the number of incinerators currently subject to outdated section 129 standards or no standards could be even higher.

42.     According to prior EPA estimates, issuing a final federal plan for the 2013 CISWI standards would eliminate 16,102 tons per year of pollution, including: 8,476 tons per year of carbon monoxide, 5,890 tons per year of sulfur dioxide, 85 tons per year of nitrogen oxides, 1,410 tons per year of filterable particulate matter, 239 tons per year of hydrogen chloride, 1.6 tons per year of lead, 0.61 tons per year of cadmium, 0.19 tons per year of mercury, and 60

grams per year of dioxins and furans.

**Other Categories of Solid Waste Incinerators**

43.     Under EPA's current standards, OSWI include institutional waste incinerators and so-called "very small" municipal waste combustors. 40 C.F.R. § 60.3078. Institutional waste incinerators combust waste at institutions such as correctional institutions, military bases, laboratories, and universities. *Id.* "Very small" municipal waste combustors are those with capacity to combust up to 35 tons per day of municipal solid waste or refuse-derived fuel from the general public and residential, commercial, institutional, and industrial sources. *Id.*

44.     EPA has estimated that 174 incinerators should be regulated as OSWI under 40 C.F.R. Part 60, Subparts EEEE and FFFF. These incinerators are located in Alaska, Arizona, Arkansas, California, Colorado, Florida, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Nebraska, New Hampshire, New Jersey, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Wisconsin.

45.     EPA promulgated performance standards for existing OSWI on December 16, 2005.

46.     Most states submitted neither an approvable state plan nor a negative declaration within two years—that is, between December 16, 2005, and December 16, 2007—as required under 42 U.S.C. § 7429(b)(3). 40 C.F.R. § 62, Subparts B-DDD (stating whether states submitted negative declaration or state plan).

47.     Thus, since December 16, 2007, more than fifteen years ago, the Clean Air Act required EPA to "develop, implement and enforce" a federal plan implementing the 2005 OSWI standards. 42 U.S.C. § 7429(b)(3).

48.     On December 18, 2006, EPA proposed a federal plan implementing the 2005

OSWI performance standards in states that had submitted neither an approvable state plan nor a negative declaration. "The emission limitations in this proposed OSWI Federal plan [we]re the same as those contained in the [performance standards]." EPA, Federal Plan Requirements for Other Solid Waste Incineration Units Constructed on or Before December 9, 2004; Proposed Rule, 71 Fed. Reg. 75,816, 75,820 (proposed Dec. 18, 2006).

49.     Despite the requirements of the Act, EPA never issued a final federal plan.

50.     As a result of EPA's inaction, OSWI in some states are subject to no emission standards under section 129 of the Clean Air Act.

51.     According to prior EPA estimates, implementing the 2005 OSWI performance standards for existing incinerators in all states would eliminate 1,925 tons per year of pollution, including: 837 tons per year of hydrogen chloride, 598 tons per year of sulfur dioxide, 245 tons per year of nitrogen oxides, 227 tons per year of particulate matter, 13 tons per year of carbon monoxide, 4.6 tons per year of lead, 0.49 tons per year of mercury, 0.33 tons per year of cadmium, and 300 grams per year of dioxins and furans.

**EPA's Continued Failure to Act**

52.     Sierra Club brought EPA's failure to timely issue federal plans for CISWI and OSWI to the agency's notice through a deadline suit filed in 2016. *Sierra Club v. Wheeler*, 956 F.3d 612, 614 (D.C. Cir. 2020). Rather than issue the long-overdue federal plans, EPA fought the lawsuit, arguing that a deadline suit did not lie because the Clean Air Act does not impose a two-year deadline for the issuance of federal plans.

53.     Although the D.C. Circuit ultimately agreed that 42 U.S.C. § 7429(b)(3) does not establish a two-year deadline for issuance of federal plans, the Court specifically noted that the issue of whether EPA had unreasonably delayed discharging this statutory obligation was not

before it. *Id.* at 616-18; *id.* at 616 n.2. Thus, the *Sierra Club* decision left open the option of enforcing 42 U.S.C. § 7429(b)(3) through an unreasonable delay suit.

<u>**Health and Environmental Effects of Incinerators' Air Pollution**</u>

54.     Combustion of solid waste releases many toxic air pollutants, including metals such as lead, cadmium, and mercury; particulate matter; toxic organics such as chlorinated dibenzo-p-dioxins/dibenzofurans (dioxin, furans); carbon monoxide; nitrogen oxides; and acid gases such as hydrogen chloride and sulfur dioxide.

55.     According to EPA and other health authorities, the air pollutants emitted by CISWI and OSWI can cause serious acute and chronic human health effects, including cancer and death.

56.     Lead is a persistent, bioaccumulative, and toxic heavy metal that poses a danger to human health and ecosystems. In humans, lead can adversely affect the nervous, renal, immune, cardiovascular, reproductive, and developmental systems.

57.     Children are most vulnerable to the impacts of lead. Childhood exposure to lead can cause devastating and lifelong health problems, including permanent neurological damage, behavioral disorders, cognitive impairments, and even death.

58.     Scientists have identified no safe level of lead in a child's blood.

59.     Lead can also lead to decreased growth and reproduction in plants and animals and negatively impact vertebrates' nervous systems.

60.     Cadmium can damage the respiratory, musculoskeletal, and renal systems, and even cause death. The U.S. Department of Health and Human Services determined that cadmium and cadmium compounds are known human carcinogens.

61.     Mercury can affect the nervous and renal systems and cause tremors,

incoordination, impaired vision, impaired learning and memory, and mood changes. Mercury can also damage the developing fetal brain and nervous system.

62.     Exposure to particulate matter is linked to an increased risk of heart attacks, strokes, and premature death from respiratory and cardiovascular causes.

63.     Particulate matter can also contribute to environmental damage, reduce diversity in ecosystems, damage farm crops, deplete nutrients in soil, and alter the nutrient balance in bodies of water.

64.     Dioxins are highly toxic and can cause cancer; damage the immune, reproductive and developmental systems; and interfere with hormones. Once released, dioxins persist in the environment and bioaccumulate in the food chain.

65.     Furans are reasonably anticipated to be a human carcinogen.

66.     Breathing air with a high concentration of carbon monoxide reduces the amount of oxygen transported to the brain, heart, and other critical organs. Carbon monoxide can be particularly harmful for those with preexisting heart issues.

67.     Breathing air with elevated levels of nitrogen dioxide, one form of nitrogen oxides, can aggravate the respiratory system and preexisting respiratory diseases.

68.     Nitrogen dioxide also negatively impacts the environment by contributing to dead zones in coastal waters, including the Chesapeake Bay, and interacting with other chemicals to form acid rain, which harms sensitive ecosystems such as lakes and forests.

69.     Nitrogen oxides, including nitrogen dioxide, contribute to the formation of ground-level ozone pollution, which harms human and environmental health. Ambient ozone can cause or worsen asthma attacks, lung inflammation, reduced lung function, and respiratory symptoms. Both short-term and long-term exposure to ozone is associated with increased

13

hospitalizations and deaths from respiratory causes. Research has also linked long-term exposure to ozone to direct negative impacts on the cardiovascular system.

70.     As EPA has repeatedly recognized, children are especially vulnerable to the harmful effects of ozone, including asthma. Asthma-related hospitalizations and deaths are elevated among children, particularly Black children. In fact, "Black children are two times as likely to be hospitalized for asthma and are four times as likely to die from asthma as White children." EPA, *Children's Environmental Health Disparities: Black and African American Children and Asthma* 3, https://www.epa.gov/sites/production/files/2014-05/documents/hd_aa_asthma.pdf.

71.     Ozone can also damage vegetation including forests, commercial trees, and agricultural crops.

72.     Exposure to high levels of hydrogen chloride can cause irritation of the eyes, skin, and respiratory tissues, and can lead to death in extreme cases.

73.     EPA has long recognized that carcinogens have no safe level of human exposure and that cancer risk is additive. *See Nat. Res. Def. Council v. EPA*, 824 F.2d 1211, 1215 (D.C. Cir. 1987) (observing that EPA determined "that known and probable carcinogens have no safe threshold"); *see also* S. Rep. No. 101-228, at 175 (1989), reprinted in 1990 U.S.C.C.A.N. 3385, 3560 ("Federal Government health policy since the mid-1950s has been premised on the principle that there is no safe level of exposure to a carcinogen.").

74.     Prenatal or early childhood exposure to carcinogens and other air pollutants increases an individual's lifetime cancer risk and other health risks.

75.     Socioeconomic disparities and related stressors increase vulnerability to carcinogenic and other toxic exposures.

76.     People living near CISWI and OSWI are sometimes exposed to additional sources of toxic air pollution and routes of exposure, including exposure through water and soil.

## ALLEGATIONS OF INJURY

77.     Sierra Club's members are harmed, and will continue to be harmed, by EPA's failure to take the actions required by section 129(b)(3) of the Clean Air Act for CISWI and OSWI.

78.     Sierra Club's members live, work, travel, recreate, attend school or educational programs, provide healthcare to family members, and engage in a variety of other activities near CISWI and OSWI. Sierra Club's members suffer harm to their health, recreational, aesthetic, educational, professional, and other interests due to exposure to hazardous air pollutants emitted by CISWI and OSWI. Exposure to hazardous air pollutants emitted by CISWI and OSWI has adverse health effects, which may include respiratory, neurological, developmental, and reproductive harm; damage to bodily organs and the central nervous system; cancer; and temporary and permanent disabilities, as well as other health effects. Sierra Club's members are concerned that hazardous air pollutants from CISWI and OSWI are present in the locations where they live, work, travel, recreate, attend school or educational programs, provide healthcare to family members, and engage in other activities. Their reasonable concerns about increased exposure from such activities and other resulting harms diminish their enjoyment of places and activities they enjoy, and thereby harm their recreational, aesthetic, educational, professional, and other interests. Sierra Club has over 216,000 members across states with EPA-identified CISWI and OSWI.

79.     Further, CISWI and OSWI emit air pollutants that can damage surrounding wildlife, plants, waters, land, communities, and ecosystems, and thus also harm Sierra Club's

members' recreational, aesthetic, educational, professional, and other interests in those wildlife, plants, waters, land, communities, or ecosystems. As detailed above, the hazardous air pollutants emitted by CISWI and OSWI—including lead, particulate matter, and sulfur dioxide—can damage trees, wildlife, and ecosystem and crop diversity. CISWI and OSWI also emit nitrogen dioxide, which contributes to the formation of ground-level ozone pollution that also harms ecosystems by damaging plant species and adversely impacting wildlife habitat. These impacts make it more difficult for Sierra Club's members to observe, cultivate, study, research, write about, or enjoy wildlife, plants, or ecosystems, and to enjoy hunting and fishing.

80.     EPA's failure to take the actions required by section 129(b)(3) of the Act deprive Sierra Club's members of the cleaner air that would result from those actions. Consequently, EPA prolongs and increases Sierra Club's members' exposure to injurious air pollutants and the resulting health, recreational, aesthetic, and other injuries as described above. EPA also prolongs and increases the hazardous air pollutant exposure of local communities, wildlife, plant, water, land, and ecosystems, resulting in harm to Sierra Club's members' interests, as described above.

81.     Sierra Club and its members who live near energy recovery units suffer additional harm because EPA has never issued a federal plan implementing standards that regulate those units as CISWI. This inaction means that energy recovery units are still operating without regulation under section 129. Such units are not subject to emission limits, operator training requirements, monitoring requirements, recordkeeping requirements, reporting requirements, or permitting requirements. EPA's inaction significantly increases the amount of injurious air pollution to which Sierra Club's members are exposed.

82.     Sierra Club and its members who live near OSWI suffer additional harm because, although the majority of states never submitted an approvable state program or negative

declaration, EPA has never issued a federal plan. As a result of EPA's inaction, many OSWI are still operating without regulation under section 129. Such units are not subject to emission limits, operator training requirements, monitoring requirements, recordkeeping requirements, reporting requirements, or permitting requirements. EPA's inaction significantly increases the amount of injurious air pollution to which Sierra Club's members are exposed.

83.     Sierra Club and its members are further denied important information that would be publicly available if EPA issued federal plans for CISWI and OSWI. Such information includes a final inventory of CISWI and OSWI, reports on these incinerators' emissions, and permitting documents for these incinerators once the federal plans became effective. Sierra Club and its members would use this information to work for stronger health and environmental protections; to educate members, supporters, and the public pursuant to their organizational missions; and to protect themselves and their families from hazardous air pollutants and affected land, water, and food. Denial of this information impairs Sierra Club's ability to provide information and services to its members to assist them in protecting their interests, hampers the ability of Sierra Club and its members to take actions to protect their health and communities, and diminishes members' enjoyment of activities in their daily life.

**CLAIMS FOR RELIEF**

**Unreasonable Delay in Issuing Final Federal Implementation Plan for CISWI Performance Standards under Clean Air Act Section 129(b)(3)**

84.     The allegations of all foregoing paragraphs are hereby incorporated as if set forth fully herein.

85.     EPA's ongoing failure to issue a final federal plan for performance standards for Commercial and Industrial Solid Waste Incinerators, 40 C.F.R. Part 60, Subparts CCCC and DDDD, as required by 42 U.S.C. § 7429(b)(3), constitutes "unreasonable delay" in the

performance of a mandatory act or duty within the meaning of section 304(a) of the Clean Air Act.

86.     Each day EPA fails to take these legally required actions, it commits new, additional, and ongoing violations of its duties under section 129(b)(3) of the Clean Air Act. 42 U.S.C. § 7429(b)(3).

### Unreasonable Delay in Issuing Final Federal Implementation Plan for OSWI Performance Standards under Clean Air Act Section 129(b)(3)

87.     The allegations of all foregoing paragraphs are hereby incorporated as if set forth fully herein.

88.     EPA's ongoing failure to issue a final federal plan for performance standards for Other Solid Waste Incineration Units, 40 C.F.R. Part 60, Subparts EEEE and FFFF, as required by 42 U.S.C. § 7429(b)(3), constitutes "unreasonable delay" in the performance of a mandatory act or duty within the meaning of section 304(a) of the Clean Air Act.

89.     Each day EPA fails to take these legally required actions, it commits new, additional, and ongoing violations of its duties under section 129(b)(3) of the Clean Air Act. 42 U.S.C. § 7429(b)(3).

### PRAYER FOR RELIEF

WHEREFORE, Sierra Club respectfully requests, for Commercial and Industrial Solid Waste Incineration Units, 40 C.F.R. Part 60, Subparts CCCC and DDDD, and (2) Other Solid Waste Incineration Units, *id.* Subparts EEEE and FFFF, that the Court:

(1)     Declare that EPA's failure to issue a final federal plan for CISWI and a final federal plan for OSWI constitute "agency action unreasonably delayed" within the meaning of 42 U.S.C. § 7604(a);

(2)     Order EPA to issue a final federal plan for CISWI and a final federal plan for

OSWI, in accordance with an expeditious deadline specified by this Court;

WHEREFORE, Sierra Club respectfully requests, for each of the above-listed obligations at issue in this case, that the Court retain jurisdiction to ensure compliance with this Court's decree, award Sierra Club the costs of this action, including attorney's fees, and grant such other relief as the Court deems just and proper.

DATED:          February 15, 2023          Respectfully submitted,

/s/ Deena Tumeh
Deena Tumeh (D.C. Bar No. 1741543)
Neil Gormley (D.C. Bar No. 1008462)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
dtumeh@earthjustice.org
ngormley@earthjustice.org

*Counsel for Plaintiff Sierra Club*